The Honorable, the United States Court of Appeals for the First Circuit is now in session. All persons having any business before this Honorable Court may give their attendance and they shall be heard. God save the United States of America and this Honorable Court. Court is in session. Today's case will be called as previously announced and the times will be as allotted to counsel. The first case today is New Hampshire Lottery et al. versus William P. Barr et al. Appeal number 191835. Good morning, attorneys Galdieri and McGill, counsel for the FLEs. Please mute your radio, your audio, I should say. Attorney Sandberg, please unmute your audio and proceed with your statement which is limited to two minutes. Thank you, Your Honor. Good morning and may it please the Court. Jeff Sandberg for the United States. With the Court's permission, I'd like to reserve a few minutes for rebuttal, four minutes if possible. If it's possible, I don't know if you are allowed that much time. If it is, it's granted. Thank you, Your Honor. The DOJ Office of Legal Counsel opined in 2018 that the prohibitions in Section 1084A of the Wire Act are not uniformly limited to sports gambling. That is all that OLC opined. OLC did not opine on whether the Wire Act applies to state lotteries and their vendors and if so, as to which activities or to what extent. The Deputy Attorney General confirmed in a subsequent memorandum that the department currently has no position on how or whether the statute applies to plaintiffs or others in their class. He expressly announced that the department will not pursue enforcement against plaintiffs or other state lottery systems unless and until a determination is made, one, their conduct is actually illegal and two, some further warning is given. As of right now, plaintiffs face no threat of prosecution for anything they've done in the past, anything they're currently doing, or anything they will do in the future indefinitely. Those facts demonstrate that there's no Article III case or controversy here. For pre-enforcement claims to be justiciable, plaintiffs must show that they face a credible threat of prosecution now. There's not only a lack of a credible threat, there's no threat at all. Indeed, at this point, there's not even any adversarialness on the question whether plaintiff's conduct is illegal. The other threshold legal issue in this case, which is raised only on the state admin law claim, is that there's no final agency action reviewable under the APA. It's not clear why the district court saw the need to reach this APA claim given that it provides no additional relief beyond what the plaintiffs already got on their pre-enforcement claim, which is a declaration that their conduct is lawful and they cannot be prosecuted. But in any event, having reached the claim, the district court fundamentally erred in ruling that an OLC opinion standing alone is final agency action. OLC opinions are advice internal to the legal rights of private parties out in the world. An OLC opinion may well be a precursor to final agency action if an agency later takes action premised on it. But in that case, it is the further agency action that is the focus of review and not OLC's pre-decisional advice. I believe your two minutes are up. And I will proceed to ask you a couple of questions within possibly four minutes. Am I to understand that your position is that there's no possibility that the 2018 Office of Legal Counsel interpretation of the statute could be enforced at any time in the future? Is that what you're saying? Against these plaintiffs, the Deputy Attorney General has made clear the department will not pursue enforcement against these plaintiffs unless and until one, their conduct is determined to be unlawful and two, some further warning is given. So as it stands, they will not be subject to prosecution. That's correct. Will you answer whether it's at any time in the future? Well, the department has not said unequivocally that state lotteries are not subject to the statute. It has no position on that question. But we're not arguing that what they're doing is unlawful. There's no adversarialness on that question yet. There's no credible threat of prosecution at this time. And that's the Article III test. If in the future the department were to say, you know, having considered the question, we believe plaintiff's conduct to be unlawful to the extent of this particular sale of products over the internet, at that point, you may well have a rife Article III dispute. And we can debate at that point whether there's a credible threat of prosecution. But at this point, we're not there yet. The department has not made any immediate enforcement, and it has indicated that enforcement would only happen based on a future public statement that plaintiff's conduct is illegal. Is the 2018 interpretation a change in the interpretation of the statute? It is a change, Your Honor. In all, OLC in 2011 had opined that the Wire Act was, all four offenses of the Wire Act were uniformly limited to sports gambling. That itself had been a departure from the department's position for 50 years, which was that the Wire Act was not uniformly limited to sports gambling. And what's particularly noteworthy is that in that 50-year period, the federal government never brought any prosecutions against state lotteries or their vendors, even though it was enforcing the statute against numerous other forms of non-sports gambling. Let's stick to the 2018. Am I to interpret your answer that it is a change in the interpretation of the statute? It's a change in the interpretation of the statute from 2011. Hello, excuse me. You can answer yes or no. It would save some time. Yes. Yes, it is. I'm not sure what the significance of that is. Why doesn't that change require some action under the Administrative Procedure Act? Because this is a criminal statute that is interpreted by courts. The DOJ gets no deference. OLC gets no deference from this court on how it interprets the statute, which makes this remarkably different from an APA case where you've got to worry about it. It doesn't matter whether the department has written a long reasoning or short reasoning on its legal interpretation here. This is just an abstract legal interpretation. It's entitled to no deference. And so to the extent the amici in this case are arguing that the department acted arbitrarily because it failed to give adequate consideration to reliance interests of parties, well, that's only relevant when an agency is claiming Chevron deference. If you go and read the cases cited in their brief, Smiley v. Citibank and Encino Motor Cars, that's about whether an agency gets Chevron deference. But the DOJ is not claiming Chevron deference here. And if this court were to reach the merits... Excuse me. Did the Department of Justice urge lack of finality before the district court? Yes, it did. We argued that the APA claim was not proper. In our reply brief, we cite to the relevant... I think we cite to our filing in district court. I don't have it immediately handy. I'd be happy to get you the citation on rebuttal. Please send... Okay. Yes. Okay. But you claim that you did raise that issue of lack of finality before the district judge? Yes, we did. We very much did so. The plaintiffs have tried to... They've said, look, we haven't teed up the final agency action argument in precisely the same way that we're doing it in this court. And that's because the district court committed errors in its reasoning that we didn't fully anticipate. But we absolutely argued that there was no final agency action reviewable under the APA. We absolutely argued that the plaintiffs could get review of the merits of this question if they could satisfy Article 3 standing and ripeness. However, we don't think that this is a ripe case or controversy because they can't... Any of the ways that this court has recognized for showing a credible threat of prosecution, none of them exist here. There's no threat of enforcement against these parties. There's been no threat of enforcement against other state lotteries. There's been no history of enforcement against state lotteries. That's time, Judge. Thank you. My four minutes are up. Judge Lynch, do you have any questions for Mr. Sandberg? Yes, I do. Mr. Sandberg, predictably, you're here arguing heavily relying on the ripeness issue. But this litigation was started as a result of the alarm in the various state lotteries as to the 2018 change in position. And then the enforcement memo, which happened. And only after that, after the plaintiffs had filed their office for the first time, say, in essence, gee, wait a minute, we didn't mean what we said earlier. The issue of state lotteries is a complicated one. And now, we want to take another look at it. And therefore, there's not a case or controversy. So let's go back to the issue. After the lawsuit was brought, before you issued this sort of retraction, is it your position that before that time, there was an article three case or controversy and that the issue was ripe? No, there absolutely was not an article three case or controversy at that point. The factors that this court looks to in deciding whether there's a credible threat of prosecution were no more present in February 2019 when the suit was filed than they were later in April. And I would respectfully disagree with the characterization that this was a retraction or a change from what the department had said before. What the department said in the January 2019 memo was that it was going to give time for businesses that relied on the prior OLC opinion to bring their operations into compliance with federal law. It didn't speak to state lotteries or their vendors. Okay, counsel, I get the point. But let's look at that earlier period before March. And could you tell me why you think the case was not ripe at that point? Because we had not taken a public position that the plaintiff's conduct is illegal. We had not pursued any enforcement against state lotteries. Counsel, nothing in your 2018 interpretation excluded state lotteries. So are you making a sort of, the case wasn't ripe because what we said was vague? I suppose so, Your Honor. I mean, there's only one question that was addressed in the OLC opinion. There are many questions to be answered under the Wire Act, right? One is, how if at all does this statute apply to state lotteries that didn't exist in 1961 when the Wire Act was enacted and only came into being later? The only question that OLC opined on is, are these offenses uniformly limited to sports gambling? And OLC said no. But there are other questions to be answered under the statute. One is, does the statute enacted in 1961 prohibit conduct by state lotteries that began in the 1960s and has evolved over time, taking different forms in how the wires are used? Congress has enacted statutes since then that expressly recognize that state lotteries are engaged in conduct. There's express exceptions for state lotteries under 18 USC 1307, for example. These are difficult questions and the department would have to have to take time to consider them before it's, and frankly, you know, this is not a question that is a significant priority for the department relative to other questions it's facing. And so, you know, certainly if the department thought that it wanted to go after state lotteries, it wouldn't have taken, you know, 14. This question has been pending with the department for some time, as you'll probably hear the plaintiff say, but if this was a huge priority, if there actually was a credible threat of prosecution, certainly the department would have, you know, taken some action. It seems to me there were considerable reliance interests, not only in the states, but also in the ancillary businesses, reliance interests that caused them to invest hundreds of millions of dollars based on the 2011 decision. And those reliance interests were put into jeopardy by the 2018 decision. You may say it's vague, but they certainly felt that their interests were on the merits. Should we not decide your rightness issue as you want? Is it really the position of the government now that you are taking no position whatsoever as to the meaning of the Wire Act as challenged in this lawsuit? We are taking no position on the Wire Act as it may apply to state lotteries or their vendors, which are the plaintiffs to this case. Neil Pollard, Pollard Banknote, and the New Hampshire Lottery Commission are state lotteries and their vendors, and we have no position on whether their conduct is unlawful, and we have made a public commitment that we will not enforce them for anything they have done in the past, are currently doing, or will do in the future. We have taken a position that the Wire Act is not uniformly limited to forced gambling, and there are entities that are not state lotteries for their vendors that, as you point out, may have acted in reliance on the 2011 OLC opinion. However, those parties are not plaintiffs in this court, and so the Article III question is, have these state lotteries and their vendors established that they have a credible threat of prosecution? As to other entities, non-state lotteries, they are currently subject to a forbearance by the Department, and that was the subject of the 28-J letter we sent you earlier this week. On the merits of the question, the phrase on which the district court relied here, the phrase, assisting in the placing of bets or wagers on any sporting event or contest, appears only once within the statute's four prohibitions. It's at the end of Offense 2, and the appropriate inference from the text and structure, looking at 1084A, the general rule, and 1084B, the exceptions, is that that phrase modifies only the particular prohibition that it's a part of. Congress didn't put the sporting event or contest modifier in a preparatory clause. It didn't repeat it in every clause. It didn't use express shorthand. All of those things it did do in 1084B, or sorry, the latter two things it did do in 1084B, the exceptions, it referred to sporting events or contests over and over again. Thank you, counsel. I have it. I will defer to my colleague, Judge Kayada, at this point. Judge Kayada, you have questions? I had a couple of questions for counsel. And on the standing issue, I had thought that one of the justifications the 2018 opinion cited for changing the view from 2011 was to precipitate judicial review. I think it says that, doesn't it? Yes, it does. It recognizes that if a U.S. attorney were to pursue, for example, enforcement of the Wire Act against an online poker company, and that company was indicted, the company could move to dismiss that indictment in a criminal proceeding saying, I don't think my conduct is covered by the Wire Act, and then there would be judicial review at that point. But OLC wasn't saying that we anticipate pre-enforcement review by parties whose I didn't see any distinction between lotteries run by states and other forms in that citation to judicial review. That's right. OLC was just making the general point, which comes up, you know, often in questions about whether, you know, as it did under the Defense of Marriage Act, where the department, having concluded that the law was unconstitutional, nonetheless continued to enforce it so that there could then be an Article III case or controversy for this court, among others, to opine on the question. It was just OLC observing that if we allow prosecutors to go forth and test this application of the Wire Act against parties engaged in non-sports forms of gambling, there would be judicial review in the posture, most likely, of a motion to dismiss the indictment. But OLC wasn't, you know, saying we think that, you know, we expect pre-enforcement review challenges to be brought by state lotteries. And then if I'm understanding the present status quo as you've explained it, I think what you're saying, and correct me if I'm wrong, but I think what you're saying is that these state lotteries that bring in hundreds of millions of dollars for the states and are incorporated in their budget planning and their budget, that any state could wake up tomorrow morning and find out that if it doesn't substantially change its lottery within 90 days, its officials could go to jail. Yes, if the department changes its position and announces that it thinks that state lotteries are engaged in conduct that is illegal, at that point, I think the plaintiffs would have a much stronger, and frankly, a quite strong argument that they should be able to obtain pre-enforcement review at that juncture. But we're not there yet. As it stands, we've not only disclaimed any enforcement, we don't even disagree with them as to whether their conduct is illegal or not. There's no adversarialness as to these plaintiffs yet in this litigation. If they get that call from you tomorrow, starting the 90-day clock, what do they do the day after tomorrow? Aren't these sort of like aircraft carriers? You can't turn them around quickly. The state budget is contingent on the funding. What do they do the day after they get that call from you? Although the department has committed itself to providing at least that 90-day forbearance period, there's nothing that prevents the department from taking the considerations that you quite rightly have raised into account. For parties that are not state lotteries and their vendors, for the other online poker companies of the world, there's been a lengthy forbearance period during the length of this litigation. Certainly, state lotteries have a tremendous voice within their state governments. Right now, as we sit here today, if I'm understanding you correctly, it's 90 days. On the 91st day, you could find yourself arrested. Yes, but that's not enough to show a credible threat of prosecution. We never pursued state lotteries and their vendors with indictments before. The only thing the plaintiffs have pointed to, which I'm sure they'll call to your attention, is a 2005 letter that was sent to the Illinois lottery about a pending bill in the Illinois legislature. That letter cited a few different statutes, not just the Wire Act. It was passed before UGA. It referred generally to unlawful internet gambling. It didn't speak to the way that state lotteries carry out their traditional operations. That piece of evidence is a very thin reed that you're going to be hearing about. Aside from that, there's no history of enforcement against anything you could call enforcement in the entire history of the Wire Act. There's no reason for these plaintiffs currently to fear enforcement. Indeed, we've disclaimed that we will pursue any enforcement against them. I've lost track of my own time. I don't know whether I have any time remaining, but whatever I have left, I would like to save for rebuttal. All right. I think at this point, you have to mute your audio. We'll hear from Attorney Gagliardi. May it please the court. My name is Anthony Gagliardi, and I represent the appellee, the New Hampshire Lottery Commission. New Hampshire... Excuse me. You have one minute. New Hampshire, like most states, Puerto Rico, the District of Columbia, and the U.S. Virgin Islands operate lotteries. These lotteries generate millions of dollars of revenue that these sovereigns use to fund critical operations of their governments. In New Hampshire, lottery proceeds are directed to support public education. In fiscal year 2018 alone, the commission generated $87.2 million for public education. The 2018 opinion puts these multimillion-dollar public education contributions at risk. It makes it illegal for entities in the business of non-sports betting or wagering to use the interstate wires to transmit bets or wagers or to transmit prizes resulting from bets or wagers. It reverses the 2011 opinion, and in doing so, restores the pre-2011 position of the Department of Justice's criminal division. As referenced in the 2011 opinion itself, the Wire Act extends to state lotteries and prohibits them from using the interstate wires to transact bets or wagers. The 2018 opinion therefore criminalizes how modern-day lotteries do business and exposes state lotteries that relied on the 2011 opinion to criminal sanction. The district court correctly concluded, however, that the Wire Act is limited solely to sports betting consistent with the 2011 opinion. That's time, Judge. Counsel, do you understand the government's position to me that they will not prosecute your clients until they decide that it's illegal activity? No, Your Honor. We understand the April 8th, 2019 memo to be a temporary act of prosecutorial discretion that holds out only the possibility that the department may revise its position in the future, but that certainly that could be retracted tomorrow, and we will have 90 days to try to conform a massive operation to the Wire Act or in the 2018 opinion or risk criminal prosecution, a 90-day period which would not be possible to comply with. Thank you. I have no further questions. Judge Lynch? Counsel, let's put the ripeness issue aside for a minute. Underlying that April 8th memo is, and I agree it doesn't give you much protection, but it is a notion that maybe state lotteries will be treated differently because they are states, and maybe the question of the extent of the Wire Act possibly could go beyond sports gambling. So they seem to be attempting to, well, leave some wiggle room, but the relief you ask for was not confined merely to yourselves. It was for a statutory interpretation of the Wire Act that will apply to a number of parties. That interpretation will apply to a number of parties who are not states, who are not state lotteries. There's no real briefing on who they might be. So is that a cause for concern for us, and if not, why not? I don't think it is, Your Honor. We asked for a declaration below on both points. We asked for a declaration that state lotteries are not subject to the Wire Act, and for a declaration that the Wire Act is limited to sports betting. We advanced several arguments regarding why the state would be exempt, or states would be exempt from the Wire Act, which were rejected. The US DOJ didn't take a position for a period of time. There was supplemental briefing after the argument on this issue, and as the District Court's opinion reflects, the US DOJ rejected our arguments as to why the Lottery Commission and state lotteries would be exempt. That appears to have caused the District Court to have issued a declaration on the other issue, which is whether the Wire Act is limited solely to sports betting. I don't believe it's cause for concern. It gives us the relief that we seek, and it is relief that, you know, we relied on when it was in the 2011... Yeah, and so more or less, you're arguing they hold themselves on their own petard. That's correct, Your Honor. They've had every opportunity to address the Dictionary Act argument that we raised. We raised arguments surrounding 18 U.S.C. Section 1307. We raised a Tenth Amendment argument. Yeah, I'm just... I'm curious about that. Suppose a state were to change its lottery and go into sports gambling. So, is the Tenth Amendment an issue if Congress tries to, under the Wire Act, say, well, those different type of state lotteries can't proceed? I think it is, Your Honor. Absent a clear statement from Congress that state lottery conduct with respect to sports betting would intend to be regulated, that that would be a problem under the Tenth Amendment. Yeah. Okay. Thank you. I give the rest of my time to Judge Calleado. Judge Calleado, you may proceed. Yes, Counsel, I do have a question. You could turn to the merits of the two OLC opinions. The government makes the point, as I understand it, that in the draft bill, there was a comma before and after the phrase, or information assisting in the placing of bets or wages on any sporting event or contest. That there was then questions in the legislative record about how, whether this applied only to sports betting or not. And then the final bill deleted those two commas. So that prompts a couple of questions. Do you agree that if those commas had been kept in, then it would have been clear that your position on the merits is correct? I think that's right, Your Honor. I think if those commas were kept in, that there would be a different construction potentially to the statute and that the results may be different. But the commas aren't in. And the question of whether the absence of, I think, particular punctuation can control the meaning of the statute in such a serious way would not swing in the other direction. At best, I think the statute would be ambiguous. And the statute has to be read holistically to further its overall purpose, which is to stop the criminal enterprise from using the interstate wires to further its gambling business. And the Wire Act accomplishes that goal cleanly with respect to sports betting. It does not accomplish that goal cleanly with respect to non-sports betting. But let me go back to your first point, because I see what you're saying when you say, when we're parsing closely grammar and syntax, we should have some caution about reading too much into the absence of something. My concern here, though, is that I'd like some help with this. It's not just the absence of the two commas. It's the deletion of two commas that were there in the draft bill. I'm having some difficulty thinking of why Congress would have taken out those two commas, other than to reject the interpretation that you and I seem to agree would have followed had the commas been there. Well, I'm not sure there's an answer to that question by looking at the record, other than to sort of speculate as to what the result of that may have been. We would suggest that the deletion of those commas does not, at best, would render the statute ambiguous and place it in a position where it could be interpreted one way or the other. But if you interpret it in accordance with the 2018 opinion, that it leads to some very bizarre and inexplicable results, like the fact that persons engaged in the business of non-sports betting would be afforded an informational advantage over persons engaged in the business of sports betting. They would be able to transmit information assisting in the placing of non-sports bets or wagers over the wires to facilitate, essentially, their criminal enterprise, while persons in the business of sports betting could not. Why would Congress do that? No purpose appears on the face of the statute or in the structure of it or in the legislative history. That's time, Judge. All right. Attorney McGill, you have one minute opening statement. Thank you, Your Honor, and may it please the Court. If the 2018 OLC opinion itself had reserved the question of the Wire Act's applicability to state lotteries, this might be a harder case for justiciability. But the 2018 OLC opinion does no such thing. Instead, it says at page 77 of the addendum, the Wire Act, quote, on its face applies to bets or wagers of any kind. And we know that OLC had lotteries specifically in mind because at addendum 88 and 89, OLC acknowledged the reliance interests of the states that, quote, began selling lottery tickets via the internet, end quote, after the issuance of the 2011 OLC opinion. But OLC said those states' reliance interests were insufficient to overcome what it saw as the plain language of the statute. OLC instead suggested that states seek relief from Congress, which OLC reminded the states, without a trace of irony, alone has the and present danger of prosecution than was present in the Hemp Council case. The next question is whether the April 2019 opinion or memo issued just three days before the summary judgment hearing somehow diffused the controversy so as to defeat the plaintiff's suit. The court should compare the statements made by the USDOJ in that April 2019 memo with those made in the Rhode Island Association of Realtors case. In that case, the state argued that the plaintiff's proposed conduct, quote, does not appear to fall within the parameters of the prohibition, end quote. Okay, just to finish, Judge Turea, but this court in that case still rejected that cautious phrasing as a, quote, far cry from a flat commitment not to prosecute. The government's post-complaint statements in this case do not even remotely approach the type of disavowal of both intent to prosecute and coverage of the statute that negated Article III justiciability in Blum v. Holder. Thank you. I will, I don't have any questions of Attorney McGill. I yield my time to Judge Litch. Um, and Justice, perhaps you can help me with this. In some ways, this case is a mixture of on the rightness issue of civil and criminal law. The government tends to pose the argument as it's merely a question of risk of enforcement, and there are responses to that. But your approach seems to go beyond that, and you ask us to parse the language and look at it in terms of the lack of any assurance of non-prosecution after clear statements that seem to say that the lotteries were subject to prosecution. Should one think of this merely as a criminal law pre-enforcement case? Well, Your Honor, I think it is quite similar to the Rhode Island Association of Realtors case, except that here, the DOJ's April 18th memo is far more equivocal as to the liability of the plaintiffs. And it arises under, frankly, much more suspicious circumstances coming just three before the hearing on the motion for summary judgment. I mean, if you wanted to look at a case that blended the civil and the criminal, you might look to the Supreme Court's decision in Abbott Labs, where the regulation there had both civil and criminal implications. And the court said there, when a regulation requires an immediate and significant change in the plaintiff's conduct of their affairs, with serious penalties attached to non-compliance, access to courts under the Administrative Procedure Act and the Declaratory Judgment Act must be permitted. Okay, that's helpful. Thank you. That ends my questioning. Judge Trajano, you have questions? Yes, I did. If you could just take a half minute or so and say, I'm having trouble understanding how does an APA claim here? You know, if you're right, let's put this rightness to one side, assume it's right, you get an adjudication one way or the other on your declaratory judgment. Why would, it seems you're saying virtually any time OLC comes out with an opinion memo, there's someone somewhere who could bring an APA action. Oh, I don't think that's what we're saying at all, Judge Kayada, and I'm happy to have the opportunity to address that. This is not any ordinary OLC opinion. The OLC opinion here is performing a rulemaking function. If this opinion were issued as a regulation of the Federal Communications Commission, there would be no doubt that it was final agency action subject to review and that the change in the executive's working law here is announced in an OLC opinion shouldn't really change that outcome. It's not deliberative advice internal to the department. It's an edict solicited by interested private persons that was published to the public at large precisely to end businesses' reliance on the 2011 OLC opinion and to generate compliance in that public at large with the new opinion. It's just like the rule in Abbott Labs. The OLC opinion purports to give an authoritative interpretation of a statutory provision that has a direct effect on the day-to-day business of the plaintiffs. I'm not aware of any other OLC opinion that does that. If you otherwise have an adequate remedy, I thought generally we stayed away from the APA. I thought we went to the APA largely when there wasn't an adequate remedy otherwise. Well, in Abbott Labs itself, both claims were brought under the Declaratory Judgment Act and under the Administrative Procedure Act. I think it's amply supported by precedent to proceed both ways. There are more parallels to Abbott Labs in this case. In Abbott Labs also, the government argued that the FDA didn't have prosecutorial power, just like it says the OLC doesn't have prosecutorial power here. But the court recognized that the exposure to the Quite unlike Abbott Labs, OLC's opinion does bind the department. You see that at page 85 of the addendum. Finally, also in Abbott Labs, the Justice Department made new representations to try to defeat review. The Solicitor General in that case, and you see this at page 154 of Abbott Labs, absolutely foreswore any possibility of the use of criminal remedies. But the court said that these subsequent representations should not suffice to defeat a lawsuit properly brought, and we would urge the same result here. Judge, that's time. Judge Tawaiya, if you wanted to allow that rebuttal at this time for the appellant, we could do that. Yes, let's do that. Thank you, Your Honor. I'll be brief. First, in response to your question about where the government raised the final agency action argument, you can find that in our motion to dismiss and opposition to plaintiff summary judgment motions. That's document number 47 on the district court docket, pages 30 to 31. Can you just repeat that slowly? Yes, document number 47, pages 30 to 31. And what is that? Oh, that's the government's motion to dismiss and opposition to plaintiff summary judgment. My colleague in the New Hampshire Attorney General's office pointed out that the district court invited us to address the question of whether states were encompassed within the term whoever. What we opined in response to that was that that  is the conclusion we gave, that there are other factors that have to be looked at. If a state, for example, started counterfeiting U.S. currency because they disagreed with federal monetary policy, we don't think that states could escape criminal consequences for that just because that relevant counterfeiting statute uses the term whoever. But the point is that it may well be part of the analysis. It's just it's not conclusive in is to get involved when there is a credible threat of prosecution. It's not to generate disputes. It's not to force the government to give advisory opinions before it is ready to do so. And here the government has not reached a conclusion that states are encompassed within the language whoever being engaged in the business of betting or wagering. I think there's a little bit of confusion about the role of OLC as well. OLC does not have a rulemaking function, contrary to what Mr. McGill said. This is not an Abbott Labs case because OLC has, and DOJ in general, has no authority to render binding legal interpretations of the criminal law that bind private parties. This is not an admin case where an agency can interpret by statute or promulgate additional requirements. Similarly, to the extent there's a credible threat of prosecution here, you have to look to is there a risk of enforcement by DOJ. The DOJ official who has power over both OLC and prosecutors has said, we will not prosecute you and we have no position on when you're covered under the act. And so to the extent that you think inferences could be drawn about whether OLC was thinking about whether states would be encompassed, that's beside the point. The official with oversight authority over prosecutors has said the department has no position on this. Finally, the realtors case is not a useful case for this court to rely on. That was a First Amendment case in which the court said, because of the background understanding that when First Amendment values are at risk, the courts must be especially sensitive to the danger of self-censorship. And I quote, courts will assume a credible threat of prosecution in the absence of compelling contrary evidence. The presumption is flipped in First Amendment cases and this is not a First Amendment case. If there are no further questions, we would ask that the judgment be reversed. I would ask you one question. What is the relevance of Abbott Labs on these issues? There is no relevance of Abbott Labs, Your Honor. I mean, the council has identified a few factual parallels, but the fundamental point is Abbott Labs is a case about agencies undertaking delegated rulemaking authority to issue rules. And that is not this case. This is a pre-enforcement challenge to a criminal statute. The department gets no deference. It doesn't get to elaborate additional you know, legal requirements on top of the statute. And an OLC opinion in the abstract is not final agency action. It is just advice to another part of the executive branch. Judge Lynch or Judge Kayada or both of them, do you have any questions? No, I'd just like to thank counsel for a very good argument on the case. I certainly enjoy that. Judge Kayada? I have no questions. Thank you. Thank you. Okay. Thank you, counsel. This session of the Honorable United States Court of Appeals is now recessed until the next session of the court. God save the United States of America and this honorable court. Counsel, you may disconnect from the meeting.